UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ ) | |
| THE VERTEX COMPANIES, INC., ) | |
| ) | |
| Plaintiff, ) | C.A. No. |
| v ) | |
| ) | **JURY TRIAL DEMANDED** |
| CLIFFORD COOPER, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

## COMPLAINT

This case involves the determination of whether Plaintiff The Vertex Companies, Inc. ("Vertex") is the rightful and legal owner of U.S. Patent No. 9,851,275, entitled "Systems and Methods for Tracing Air" ("the '275 Patent"). The '275 Patent issued in the name of Defendant Clifford Cooper ("Cooper") on December 26, 2017, while Cooper was employed by Vertex and had an obligation to assign all of his rights in the '275 Patent to Vertex under the terms of his written employment contract. Cooper, however, has refused to assign the '275 Patent to Vertex, claiming that he is the sole owner.

Accordingly, Vertex, by and through this Complaint, brings the following causes of action against Cooper: (1) breach of contract, by reason of Cooper breaching the assignment provisions of the parties' 2012 Employment Contract; (2) breach of the implied covenant of good faith and fair dealing; (3) unjust enrichment; (4) fraudulent misrepresentation; alternatively (5) a declaratory judgment that Vertex is entitled to an irrevocable license to the '275 Patent; and (6) a preliminary and permanent injunction preventing Cooper from taking any action with respect to the '275 Patent inconsistent with his obligation to assign the patent to Vertex.

## THE PARTIES

1.      Plaintiff Vertex is a Delaware limited liability corporation.  Vertex's principal place of business and corporate headquarters are located at 400 Libbey Parkway, Weymouth, Massachusetts 02189.

2.      Upon information and belief, Defendant Cooper is a citizen of New York who resides at 943 Orlando Street, Kingston, New York 12401.

3.      Vertex and Cooper are parties to a written 2012 Employment Contract.  As used herein, the term "2012 Employment Contract" includes an Offer Letter dated February 8, 2012, sent by Vertex to Cooper ("Offer Letter"), and a Proprietary Information and Inventions Agreement ("Inventions Agreement") attached as Attachment A to the Offer Letter.  A copy of the Offer Letter is attached hereto as **Exhibit 1**.  A copy of the Inventions Agreement is attached as **Exhibit 2**.

## JURISDICTION AND VENUE

4.       This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1332 (a)(1) and (c)(1), because the parties are citizens of different states and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

5.      This Court has personal jurisdiction over Cooper pursuant to the valid and enforceable forum selection provision of the parties' 2012 Employment Contract (*see* paragraph 10.1 of the Inventions Agreement (**Exhibit 2**)).

6.      This Court also has personal jurisdiction over Cooper under the Massachusetts long-arm statute, M.G.L. c. 223A, §3, because upon information and belief: (a) Cooper has transacted business in Massachusetts with respect to the subject matter of the parties' 2012 Employment Agreement; and (b) Cooper has had such minimum contacts with Massachusetts

that the exercise of personal jurisdiction over him in this Court would be consistent with the basic due process requirements of the United States Constitution.

7.      Venue is proper under the valid and enforceable forum selection provision of the 2012 Employment Contract (*see* paragraph 10.1 of the Inventions Agreement (**Exhibit 2**)); and, upon information and belief, under the provisions of 28 U.S.C. § 1391(b)(2).

**FACTS PERTINENT TO ALL COUNTS**

## I.   The February 8, 2012 Offer Letter

8.       On February 8, 2012, Vertex sent Cooper the Offer Letter setting out the terms of his potential employment with Vertex as a "Senior Industrial Hygienist" (**Exhibit 1**).

9.      The Offer Letter set out his terms of employment including compensation, working hours, employee benefits, and travel requirements.  The Offer Letter stated that Cooper would be reporting to Erik Borgesen, President of Vertex Air Quality Service, LLC, a subsidiary of Vertex that merged with the parent company in December 2013.  The Offer Letter also stated that Cooper's "office" would be located at Vertex's New York, N.Y. facility, and that he was expected to work out of that office at least once a week provided, however, that Cooper could periodically work from his home office in Kingston, N.Y.

10.     Vertex's employment offer to Cooper was on an "at-will" basis.  The termination provisions set out on page 2 of the Offer Letter read as follows:

> You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the Company.  Likewise, the Company may terminate your employment at any time and for any reason whatsoever, with or without cause or advance notice.

11.     The Offer Letter also contained several provisions concerning Vertex's proprietary information and intellectual property and stated, in part:

As a Company employee, you will be expected to abide by Company rules and regulations.  One of the conditions of your employment with the Company is the maintenance of the confidentiality of the Company's confidential and proprietary information.  In your work for the Company, you will be expected not to use or disclose any confidential information, including trade secrets, of any former employer or other person to whom you have an obligation of confidentiality.  Rather, you will be expected to use only that information which is generally known and used by persons with training and experience comparable to your own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.  You also should not bring onto the Company premises any unpublished documents or property belonging to any former employer or other person to whom you have an obligation of confidentiality.  During our discussions about your proposed job duties, you assured us that you would be able to perform those duties within the guidelines just described.  The Company's Proprietary Information and Inventions Agreement is incorporated herein and attached as <u>Attachment A</u>.  Your commencement of employment with the Company shall constitute acceptance of all the terms and conditions contained in the Proprietary Information and Inventions Agreement.

(Exhibit 1 pp. 1-2).

12.     The Offer Letter also stated: "This letter, together with all Attachments and Exhibits, forms the complete and exclusive statement of your employment agreement with the Company.  The employment terms in this letter supersede any other agreements or promises made to you by anyone, whether oral or written.  This letter agreement cannot be changed except in a writing signed by you and a duly authorized Officer of the Company."

13.     Cooper signed the Offer Letter as "Accepted" on February 17, 2012.  Cooper returned both the signed Offer Letter and the Inventions Agreement (Attachment A to the Offer Letter) to Vertex's corporate headquarters located at 400 Libbey Parkway, Weymouth, Massachusetts 02189.

## II.  <u>The Proprietary Information and Inventions Agreement</u>

14.     Paragraph 10.1 of the Proprietary Information and Inventions Agreement ("Inventions Agreement") states that "[t]his Agreement will be governed by and construed according to the laws of the Commonwealth of Massachusetts, as such laws are applied to

agreements entered into and to be performed entirely within Massachusetts between Massachusetts residents" (**Exhibit 2**).  Under paragraph 10.1, Cooper "expressly consent[ed] to the personal jurisdiction of the state and federal courts located in Boston, Massachusetts for any lawsuit filed there against [him] by Company arising from or related to this Agreement."

15.     Paragraph 1.1 of the Inventions Agreement required Cooper, "[a]t all times during [his] employment and thereafter", [to] hold in strictest confidence and . . . not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with [his] work for the Company, or unless an officer of the Company expressly authorizes such in writing."  Cooper also agreed in paragraph 1.1 to "obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that incorporates any Proprietary Information and/or disparages the Company."

16.     Paragraph 1.2 of the Inventions Agreement defines "proprietary information":

"Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, ideas, processes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques (hereinafter collectively referred to as "Inventions"); and (b) information regarding plans for research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, prices and costs, suppliers and customers; and (c) information regarding the skills and compensation of other employees of the Company.

17.     Paragraph 1.1 of the Inventions Agreement required Cooper to "assign to the Company any rights [he] may have or acquire in such Proprietary Information and recognize[d] that all Proprietary Information shall be the sole property of the Company and its assigns."

18.     Section 2 of the Inventions Agreement is entitled "Assignment of Inventions". Subsection 2.2 reads, in relevant part, as follows:

2.2   **Prior Inventions**. Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit 1 (Previous Inventions) attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "*Prior Inventions*").

19.     Under paragraph 2.2, of the Inventions Agreement, Cooper further agreed: "If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent."

20.     Paragraph 2.3 governs the assignment of inventions to Vertex that Cooper made, conceived, or reduced to practice while a Vertex employee.  Paragraph 2.3 reads:

2.3   **Assignment of Inventions**.  Subject to Sections 2.4 and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "Company Inventions."

21.     In paragraph 7 of the Inventions Agreement, Cooper agreed that Vertex has the right "to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief . . .."

22.     Paragraph 10.4 of the Inventions Agreement contains this survival clause:  "The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee."

23.     Through his employment and course of dealing with Vertex over the past six years, Cooper consistently represented to Vertex that: (a) he considered himself to be bound by the obligations set forth in both the Offer Letter and the Inventions Agreement; and (b) he would abide by all the obligations on him set forth in those two documents.

24.     In connection with paragraph 2.2 of the Inventions Agreement, Cooper submitted to Vertex a "Previous Inventions" form dated February 17, 2012, a true and accurate copy of which is attached hereto as **Exhibit 3**.  In that form, Cooper represented that before his "engagement by the Company", he "made or conceived or first reduced to practice . . . alone or jointly with others" an "air tracer method using d-limonene tracer and PID detector."  Cooper also represented in the Previous Inventions form that this invention was "relevant to the subject matter of [his] employment by Vertex."

25.     Prior to the commencement of his employment with Vertex, Cooper had not made, conceived or reduced to practice, alone or jointly with others, an air tracer method using d-limonene tracer and PID detector.

### III.  The '275 Patent

26.     On March 27, 2015, Cooper filed with the U.S. Patent and Trademark Office ("Patent Office") provisional patent application No. 62/139,449, entitled "Systems and Methods for Tracing Air," and listing Cooper as the sole inventor.

27.     On March 30, 2015, Cooper filed provisional patent application No. 62/168,727, also entitled "Systems and Methods for Tracing Air," and listing Cooper as the sole inventor.

28.     On March 18, 2016, Cooper filed with the Patent Office non-provisional patent application No. 15/073,674 ("'674 application"), also entitled "Systems and Methods for Tracing Air," and listing Cooper as the sole inventor.

29.     The '674 application was published by the Patent Office on September 29, 2016. The '275 Patent issued from the '674 application on December 26, 2017.  A true and accurate copy of the '275 Patent is attached hereto as **Exhibit 4**.

30.     The '275 Patent contains 20 claims directed to the invention described in the patent specification.  Claims 1-12 are written as "system" claims, and claims 13-20 are written as "method" claims.  Claim 1 is the broadest system claim, and claim 13 is the broadest method claim.  Claims 1 and 13 are reproduced below:

> 1.   A system comprising: a tracer delivery device operative to emit a tracer comprising at least one of a terpene and a terpene alcohol into air; and a detector operative to detect the tracer in the air.

*   *   *

> 13.  A method comprising the steps of: emitting a tracer comprising at least one of a terpene and a terpene alcohol into air using a tracer delivery device; and detecting the tracer in the air using a detector.

### IV.  Cooper's Work At Vertex

31.     Cooper was hired by Vertex to develop a commercial product that incorporated the invention described and claimed in the '275 Patent.  During the course of his employment with the company, Vertex funded Cooper's invention development efforts in an amount exceeding $800,000.  Specifically, Vertex provided Cooper with: (a) salary and benefits; (b) an office at Vertex's New York City location; and (c) financial investment and manpower support from other Vertex scientists and engineers to assist Cooper in conceiving, developing, testing, and reducing to practice the products and methods described and claimed in the '275 Patent.

32.     To date, Vertex has not received any documentary information from Cooper demonstrating that he (either alone or with others) made, conceived, or reduced to practice the subject matter of any claim of the '275 Patent before he joined Vertex.

33.     In fact, through his employment and course of dealing with the company over the past six years, Cooper led Vertex to believe that he considered the '275 Patent to be subject to the assignment provisions of paragraph 2.3 of the Inventions Agreement.

34.     Cooper's employment with Vertex was terminated on November 27, 2018.

## COUNT I
### (Breach of Contract)

35.     Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 34 above.

36.     The parties' 2012 Employment Contract is a valid and enforceable contract under Massachusetts law.   Vertex has performed all its obligations to Cooper under the 2012 Employment Contract.

37.     Cooper breached the 2012 Employment Contract including by refusing to assign all his rights in the '275 Patent to Vertex as required by paragraph 2.3 of the Inventions Agreement.

38.      Vertex has been damaged as a direct consequence of Cooper's breach of the 2012 Employment Contract in an amount to be determined at trial but which includes, without limitation, approximately $800,000 Vertex invested in the development of the 275 Patent.

39.     Vertex has further been damaged by Cooper's breach, because a patent owner has the statutory right to exclude all others from making, using, selling, offering for sale, and importing any product or method that embodies one or more of the patent's claims.  *See* 35 U.S.C. § 282.  Unless Cooper assigns the '275 Patent to Vertex, Cooper retains the statutory

right to exclude.  Either on his own, or by selling or licensing the '275 Patent to a third party, Cooper could damage Vertex by creating a competitor, and/or by preventing Vertex from practicing the claimed invention it paid hundreds of thousands of dollars for Cooper to develop.

40.     A patent is considered a unique form of property, and a contractual obligation to assign a patent is enforceable through the remedy of specific performance.

41.     In paragraph 7 of the Inventions Agreement, Cooper agreed that Vertex has the right "to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief . . .. "

42.     As a direct consequence of Cooper's Breach of the 2012 Employment Contract, Vertex is entitled to specific performance of paragraph 2.3 of the Inventions Agreement, such that Cooper should me made to assign to Vertex all his rights in and to the '275 Patent.

## COUNT II
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

43.     Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 42 above.

44.     The 2012 Employment Contract contains an implied covenant of good faith and fair dealing.

45.     Through his employment and course of dealing with Vertex over the past six years, Cooper consistently represented to Vertex that he: (a) considered himself to be bound by the obligations set forth in both the Offer Letter and the Inventions Agreement; and (b) would abide by all the obligations set forth in those documents.

46.      To date, Vertex has not received any documentary information from Cooper demonstrating that he (either alone or with others) made, conceived, or reduced to practice the subject matter of any claim of the '275 Patent before he joined Vertex.

47.     In fact, through his employment and course of dealing with the company over the past six years, Cooper led Vertex to believe that he considered the '275 Patent to be subject to the assignment provisions of paragraph 2.3 of the Inventions Agreement.

48.     Notwithstanding Cooper's previous course of conduct and representations, Cooper recently represented to Vertex, for the first time, that: (a) he is not legally bound by the provisions of the Inventions Agreement because he did not separately sign it; and (b) the work he did on the invention of the '275 Patent while a Vertex employee was done on his own time and with his own resources, and was not carried out as part of his employment duties at Vertex.

49.     The Offer Letter, which Cooper signed and returned to Vertex with the attached Inventions Agreement, states that Cooper's "commencement of employment with the Company shall constitute acceptance of all the terms and conditions contained in the Proprietary Information and Inventions Agreement."  During the preceding six years of his employment with the company, and before his change of heart, Cooper never represented to Vertex that he was not bound by the provisions of the Inventions Agreement because he did not sign it.  Further, before his change of heart, Cooper never represented to Vertex that the work he did on the development of the invention of the '275 Patent while a Vertex employee was done on his own time and with his own resources, and was not carried out as part of his employment duties.

50.     Over the past six years, Vertex took Cooper at his word that he was bound by the provisions of the Inventions Agreement, and would assign his rights under the '275 Patent to the company.   In reliance upon Cooper's representations and course of conduct as a Vertex employee, and invested over $800,000 in supporting his invention development efforts.

51.     Strapped for money, Cooper recently strung Vertex along by offering co-ownership rights in the '275 Patent.  Cooper made this offer even though he: (a) knew he had an

obligation to assign the entire '275 Patent to Vertex under paragraph 2.3 of the Inventions Agreement; (b) never intended to make good on the offer of co-ownership of the '275 Patent in the first instance; (c) never produced any documents refuting Vertex's patent ownership rights under paragraph 2.3 of the Inventions Agreement; and (d) acted as if the Inventions Agreement was valid and enforceable during the preceding six years of his employment.

52.    As stated above, Cooper has acted in bad faith with respect to his obligations under the 2012 Employment Contract.

53.    Had Vertex known that Cooper was going to engage in the above-described course of conduct, Vertex: (a) would never have made the substantial financial investments in Cooper's invention development efforts that it made; (b) would have brought all patent ownership issues to a head years earlier; and (c) and would never have continued Cooper's at-will employment for six years to the substantial detriment of the company.

54.    Vertex has been damaged as a direct consequence of Cooper's breach of the implied covenant of good faith and fair dealing.

## COUNT III
### (Unjust Enrichment)

55.    Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 54 above.

56.    In the event it is determined that the Inventions Agreement is unenforceable, Cooper has been unjustly enriched to the detriment of Vertex, and restitution should be made to Vertex for that unjust enrichment.

57.    For six years, Cooper led Vertex to believe that he considered all aspects of the 2012 Employment Contract to be valid and enforceable; including the assignment provisions of paragraph 2.3 of the Inventions Agreement.  And, for those six years, Cooper was enriched by

the benefits of his employment with the company, including Vertex's substantial manpower and financial investments in Cooper's invention development activities, and the know-how he gained by collaborating with other Vertex employees, all of which enabled Cooper to file patent applications on the invention while employed by Vertex.

## COUNT IV
### (Fraudulent Misrepresentation)

58.     Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 57 above.

59.     Cooper's signing of the Offer Letter, sending the Offer Letter and the attached Inventions Agreement back to Vertex, and commencing his employment with Vertex, constitute material representations that Cooper agreed to and considered himself bound by the provisions of those documents, including the invention assignment provisions of the Inventions Agreement.

60.     Throughout his employment with Vertex, Cooper also made the following material representations to his co-workers, through his words and though his conduct: (a) that he understood that his primary responsibility at Vertex, if not sole responsibility, was to develop a commercial product that incorporated what became the invention embodied in the '275 Patent claims; (b) that he understood that the projects he worked on during his six years at Vertex were dedicated to, and in furtherance of, developing a commercial product that incorporated the claimed invention of the '275 Patent; and (c) that he would assign to Vertex any invention rights he obtained that arose out of this product development work.

61.     Cooper made the representations in paragraphs 59-60 above for the purpose of inducing Vertex to make substantial investments in his invention development work, including the dedication of manpower resources and significant financial investments.

62.     Vertex relied upon Cooper's representations in making manpower and financial investments in Cooper's invention development work in excess of $800,000, and Vertex's reliance was reasonable under he circumstances.

63.     Notwithstanding Cooper's previous course of conduct as a Vertex employee, Cooper recently represented to Vertex, for the first time, that: (a) he is not legally bound by the provisions of the Inventions Agreement because he did not sign it; and (b) the work he did on the invention of the '275 Patent while a Vertex employee was done on his own time and with his own resources, and was not carried out as part of his employment duties.  Given these first-time representations, the prior material representations of Cooper to Vertex were false, and Cooper made those prior representations with knowledge of their falsity.

64.     Had Vertex known Cooper's representations were false, it: (a) would never have invested over $800,000 in Cooper's invention development efforts; (b) would have brought all patent ownership issues to a head years earlier; and (c) and would never have continued Cooper's employment for six years to the substantial detriment of the company.

65.     Vertex has been damaged by Cooper's misrepresentations in an amount to be determined at trial.

## COUNT V
### (Declaratory Judgment – Irrevocable License/Shop Rights)

66.     Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 65 above.

67.     This claim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202. There exists an actual case or controversy of sufficient immediacy and reality between Vertex and Cooper over the question of whether Vertex has any rights to the '275 Patent.

68.     Vertex has invested over $800,000 in Cooper's efforts as a Vertex employee to develop the invention of the '275 Patent into a commercial product for Vertex.  During his six years with the company, Vertex provided Cooper with critical manpower and financial resources to support his invention development work.  These resources enabled Cooper to develop the invention of the '275 Patent to the point where he could file patent applications on the invention – the first of which he filed on March 27, 2015, three years after he began working at Vertex.

69.     As a result of Vertex's investments in Cooper's invention development efforts, Vertex has obtained shop rights to the '275 Patent, and all patents subsequently issued to Cooper that derive from any of the patent applications leading to the '275 Patent ("Related Patents").

70.     As a result of Vertex's irrevocable shop rights, Vertex is entitled to a declaratory judgment that it should be granted a nonexclusive, royalty-free, perpetual, and irrevocable license to make, use, sell, offer for sale, or import any product or method covered by: (a) any claim of the '275 Patent; and (b) any claim of any of the Related Patents.

## COUNT VI
## (Preliminary and Permanent Injunction)

71.     Vertex re-alleges, and incorporates herein by reference, the allegations contained in paragraphs 1 through 70 above.

72.     Vertex has been irreparably harmed by Cooper's breach of the 2012 Employment Contract, because absent an assignment of the '275 Patent to Vertex as required under paragraph 2.3 of the Inventions Agreement, Cooper will retain the statutory right to exclude under 35 U.S.C. § 282, pursuant to which Cooper can: (a) make, use, sell, offer for sale, or import any method or product falling within the scope of any of the '275 Patent claims; (b) prevent Vertex from engaging in any of the activities listed in paragraph 71(a); and (c) license, assign, or otherwise transfer the '275 Patent or any part thereof to any third party.

73.     Vertex has no adequate remedy at law for Cooper's breach of the 2012 Employment Contract.

74.     Accordingly, Cooper should be preliminarily and permanently enjoined from engaging in any of the activities listed in paragraph 72(a) through 72(c).

## PRAYER FOR RELIEF

WHEREFORE, Vertex prays that this Court:

(a)     Enter judgment on Counts I-V of the Complaint and award Vertex all recoverable damages, fees and costs including, without limitation, pre and post judgment interest;

(b)     Grant Vertex the remedy of specific performance on Count I, and order Cooper to assign to Vertex all his right, title, and interest in and to the '275 Patent;

(c)     Preliminarily and permanently enjoin Cooper from: (i) making, using, selling, offering for sale, or importing any method or product falling within the scope of any of the '275 Patent claims; (ii) preventing Vertex from engaging in any of these activities; and (iii) licensing, assigning, or otherwise transferring the '275 Patent or any part thereof to any third party.

(d)     Alternatively to Count I, issue a declaratory judgment that Vertex is entitled to a non-exclusive, royalty-free, perpetual, and irrevocable license and shop rights to make, use, sell, offer for sale, or import any product or method covered by: (a) any claim of the '275 Patent; and (b) any claim of any of the Related Patents;

(e)     Award Vertex its attorneys' fees, costs and pre-and post-judgment interest; and

(f)     Grant Vertex such further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Vertex respectfully demands a trial by jury on all claims and issues so triable.

Dated:  December 20, 2018

Respectfully submitted,

THE VERTEX COMPANIES, INC.,
By its attorneys,

*/s/ Mark A. Berthiaume                    .*
Mark A. Berthiaume (BBO #041715)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
(617) 310-6029

*Of Counsel*

Michael A. Nicodema
(*Pro hac vice* to be filed)
GREENBERG TRAURIG LLP
500 Campus Drive
Florham Park, New Jersey
(973) 360-7932